IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-02370-MSK-MEH

ANGELO THOMAS GRUPPO,

        Plaintiff,

v.

FEDEX FREIGHT SYSTEMS, INC., a Delaware corporation,
TERRY STAMBAUGH, Vice President Human Resources, FedEx Freight System, Inc.,
an individual,
RITA MOORE, Managing Director, FedEx Freight System, Inc., an individual,
STEVE MOORE, Vice President IT Development, FedEx Freight System, Inc.,
an individual, and
SANDRA SIMPSON, Human Resources, FedEx Freight System, Inc., an individual,

        Defendants.

---

## OPINION AND ORDER GRANTING, IN PART,
## MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment **(# 99)**, the Plaintiffs' response **(# 103)**, and the Defendants' reply **(# 109)**.

## FACTS

As relevant herein, and taken in the light most favorable to the Plaintiff, in or about 2002,

the Plaintiff was employed by an entity called Viking Freight Systems in Phoenix, Arizona, when

that company was purchased by Defendant Fedex Freight Systems, Inc. ("Fedex").  In 2004, after

negotiations discussed more fully herein, the Plaintiff agreed to move to Colorado and continue

working in his same position for Fedex.

1

In 2005, a dispute arose over the attendance of Fanchon Gibson, one of the Plaintiff's subordinates.  After various discussions among the Plaintiff and other members of Fedex's management, including Defendants Steve Moore, Rita Moore, and former Defendant Bonita Lucky, Defendant Steve Moore instructed the Plaintiff to discipline or terminate Gibson for her absences.  The Plaintiff objected to this directive, believing that Gibson's absences were not excessive and were often motivated by serious illnesses of Gibson or her children, that her work performance had not been affected, and that disciplining or terminating her on these grounds would be unethical and possibly even illegal.   The Plaintiff refused the directive, and on September 1, 2005, traveled to Fedex's headquarters in Arkansas to advise its Human Resources Department, including Defendants Stambaugh and Simpson, of his concerns.  The Plaintiff returned to work in Colorado on September 6, 2006.  At that time, he was notified that his employment had been terminated, and he was escorted off the premises.

The Third Amended Complaint asserts five claims: (i) a claim entitled "wrongful termination," but which appears to be a claim of retaliation in violation of the FMLA, against all Defendants; (ii) promissory estoppel against Fedex and Defendant Steve Moore, based on alleged promises made to the Plaintiff to induce him to move from Phoenix to Colorado; (iii) outrageous conduct against Defendant Steve Moore, in that he had attempted to force the Plaintiff to engage in acts the Plaintiff believed to be unlawful, and repeatedly insulted and threatened the Plaintiff; (iv) defamation, against Fedex and "unknown employees," in that these Defendants made false statements about the Plaintiff to prospective employers; and (v) negligence, in that the Defendants negligently failed to continue his employee disability insurance after his termination.

The Defendants move (**# 99**) for summary judgment on all claims, on the grounds discussed herein.

**ANALYSIS**

**A.  Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## B.  FMLA retaliation

The Plaintiff's first claim, although designated in the Amended Complaint as "wrongful termination," is actually a claim that the Defendants discriminated against him for assisting another employee in the exercise of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*  In general, the FMLA requires an employer to provide eligible employees with up to 12 weeks of unpaid leave to address the birth or adoption of a child, or the serious health condition of an employee or an employee's family member.[1]  29 U.S.C. § 2612(a)(1).  An employer is prohibited from discriminating against an employee who avails him or herself of the rights provided by the FMLA, and the statute further prohibits an employer from "discriminat[ing]  against any individual for opposing any practice made unlawful" by the Act.  29 U.S.C. § 2615(a).

To establish a claim for FMLA retaliation, the Plaintiff must first establish a *prima facie* case by showing: (i) that he engaged in activity protected by the Act; (ii) that he suffered an adverse employment action; and (iii) that there is a causal connection between the adverse action and the protected activity.  *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).  If the Plaintiff carries that burden, the burden shifts to the Defendants to articulate a legitimate, non-retaliatory reason for the adverse action, and the Plaintiff bears the ultimate burden of showing that the proffered reason is a pretext for retaliation.  *Metzler v. Federal Home*

---

[1]Where the need for leave arises from the serious health condition of an employee or family member, leave may be taken on an intermittent basis as medical necessity requires.  29 U.S.C. § 2612(b).

*Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).  The Defendants concede that the Plaintiff's termination constitutes an adverse employment action, but they contend that the Plaintiff cannot show that he engaged in protected activity, that there was a causal connection between any such protected activity and his termination, or that the Defendants' proffered reason for his termination is pretextual.

      1.  <u>Protected activity</u>

Turning first to the question of whether the Plaintiff can show that he engaged in protected activity, the Plaintiff alleges that he refused instructions from his superiors to discipline or terminate Gibson based on her absenteeism.  The Plaintiff contends that he believed that the instruction that he discipline or terminate Gibson was "for an illegal reason," although nowhere in the cited portion of his deposition does he express a specific belief that Gibson's absences were subject to the FMLA, or that the instructions he had been given were specifically violative of that Act.  *Docket* # 103-5 at 3.  Indeed, the Plaintiff testified that he "went to the policy manual to look and see what policies Fanchon Gibson actually breached or abridged [and] found nothing there."  *Id.* at 9.  The Defendants reply that the Plaintiff's statements that he considered the instruction to discipline or terminate Gibson to be "illegal" and "immoral" is insufficient to amount to protected activity under the FMLA.

In retaliation cases under the various employment discrimination laws, an employee need not show that his employer was <u>actually</u> engaging in illegal conduct in order for his opposition to that conduct to constitute protected activity; rather, the employee need only show that he had a reasonable, good-faith belief that the conduct he opposed was discriminatory.  *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015-16 (10th Cir. 2004).  The examination of the employee's

belief involves both subjective and objective components, and thus, the employee must not only show that he subjectively believed that the challenged actions were discriminatory, but he must also show that that belief was objectively reasonable. *Crumpacker v. Kansas Dept. of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003).

The Defendants do not contend that the Plaintiff lacked a subjective good-faith belief that the instruction he received to discipline Gibson for absenteeism was illegal, and the sole question appears to be whether the Plaintiff's belief that it was illegal was objectively reasonable. This inquiry is complicated by the fact that, unlike other non-discrimination statutes, the FMLA has numerous technical requirements that must be met for its protections to apply. *See e.g.* 29 U.S.C. § 2613 (employer may require employee taking leave for serious health condition to supply certification); 29 C.F.R. § 825.114(a),(b) (regulations interpreting what constitutes a "serious health condition). On the one hand, the Court is reluctant to interpret the reasonableness requirement in such a way that employees are required to know the intricacies of the law in order to form a reasonable belief that it was violated.[2] On the other hand, absolving the complaining employee from any duty to inquire into the actual operation of the law would effectively nullify any requirement that the employee's belief be objectively reasonable.

The Court finds some guidance in what a reasonable employee would be expected to know based on the FMLA's required notices. All employers must post notices advising employees of their rights under the Act. 29 U.S.C. § 2619, 29 C.F.R. § 825.300. The text of the

---

[2]For example, many of Gibson's absences were a result of "the occasional migraine and, you know, kids being sick or I was sick." However, under the FMLA, unless an illness involves an incapacity of three or more days and ongoing treatment by a health care provider, it is not a "serious health condition." 29 C.F.R. § 825.114(a)(2). Thus, Gibson's absences for routine illnesses likely were not eligible for FMLA protection.

required notice is set out in Appendix C to the regulations implementing the Act.  29 C.F.R. part 825, Appx. C.  It advises employees that "FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave," and that "Unpaid leave must be granted for <u>any</u> of the following reasons: . . . to care for the employee's spouse, son or daughter, or parent who has a serious health condition, or for a serious health condition that makes the employee unable to perform the employee's job."  *Id.*  If the Department of Labor believes that the notice reflects the level of detail employees need to understand their rights and obligations under the law, the notice is a useful measure of what a reasonable employee's understanding of the law should entail.

The notice merely advises employees that they cannot be discriminated against for invoking rights under the FMLA, and further advises employees that they are entitled to leave for a "serious health condition."  Thus, the question presented here is whether the Plaintiff had a reasonable factual basis to believe that Gibson's absences resulted from a "serious health condition."  The notice does not go into detail as to the legal definition of "serious health condition," and thus, the Court simply considers what a reasonable employee would make of that undefined phrase.  The Court finds that a reasonable employee might very well consider the term "serious health condition" to include absences prompted by any illness that prevents one from working.  The record reflects that the Plaintiff understood that Gibson's absences were the result of "hav[ing] to take time off for illness, for children's illness[; s]he had to take two weeks off when she passed out."  *Docket* # 103-5 at 4.  Taken in the light most favorable to the Plaintiff, the

Court finds that this raises at least an issue of fact as to whether the Plaintiff engaged in protected activity under the FMLA.[3]

2. Causal connection

The Defendants also allege that the Plaintiff cannot show a causal connection between his protected activity and his termination. Typically, causal connection is shown by temporal proximity between the two events. However, the temporal distance must be "very close[ ]," or else the Plaintiff must adduce additional evidence beyond temporal proximity to *survive. Miller v. Automobile Club of New Mexico, Inc.*, 420 F.3d 1098, 1121 (10th Cir. 2005), *quoting Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir.2004) (emphasis in original). For example, the10th Circuit in *Meiners* found a six-week gap between protected activity and adverse action to be sufficient proof of causation, but rejected the assertion in *Miller* that a six-month gap, standing alone, would be sufficient to establish causation. *Miller*, 420 F.3d at 1121.

Here, the record indicates that the Plaintiff was instructed in August 2005 to talk to Gibson about her absenteeism; that "towards the end of August," the Plaintiff "t[ook] the issue" to the Vice President of HR, stating that he felt the request was illegal; and "the next working day," he was fired. *Docket* # 99-3 at 3-4. These facts are sufficient to demonstrate an issue of fact as to whether there was a causal connection.

-------

[3]The Court sees no reason to impose an obligation that an employee opposing an action that violates the FMLA to specifically identify the statute as the basis for his or her objection. Notably, an employee entitled to take leave under the FMLA need not expressly mention the statute in requesting the leave. 29 C.F.R. § 825.208(a)(2). It would be incongruous to suggest that although an employee taking leave need not even realize the FMLA might apply, a co-worker objecting to the denial of that employee's leave must expressly inform the employer that the objection arises under the FMLA.

3.  Pretext

Finally, the Defendants contend that the Plaintiff cannot show that their proffered non-retaliatory reason for his discharge is pretextual.  The Defendants contend that the Plaintiff was terminated for two reasons: (i) that he refused to participate in a corrective action plan, and (ii) that his workplace conduct was unacceptable.

Pretext is usually shown in one of three ways: (i) with evidence that the employer's stated reason for the adverse employment action was false; (ii) with evidence that the employer acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (iii) with evidence that the employer acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the employee. *Kendrick v. Penske Transportation Svcs. Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  The Plaintiff proceeds on the grounds that the proffered reasons are false.

With regard to the allegation that he refused to participate in a corrective action plan, the Plaintiff contends that the plan was never presented to him and that it was not complete at the time he was terminated.  In support of this assertion, he cites to the affidavit of Lucky, who testified that the parties did discuss a "development plan" for the Plaintiff, that the Plaintiff had agreed to it, and that Lucky did not recall whether such a plan was ever actually written up. *Docket* # 99-5 at 3.  The Plaintiff also cites to a transcript[4] of a tape recorded hearing he

------

[4]The Defendants object to the Court's consideration of the transcript on the grounds that the Plaintiff does not establish the authenticity of the transcription.  A party opposing summary judgment is not required to come forward with evidence in a form that would be admissible at trial, so long as the content or the substance of the evidence presented is admissible. *Adams v. American Guarantee and Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).  The transcript purports to be a record of a recorded conversation between the Plaintiff and some of the individual Defendants, and thus, the Defendants' statements would likely be admissible under Fed.

9

participated in, but this evidence somewhat contradicts Lucky's deposition.  In the transcript, the

Plaintiff is told that the Defendants intend to "get to an action plan for you" on issues of

communication and leadership, and the Plaintiff states that "if it's a written action plan, I won't

sign it nor will I talk it."  *Docket* # 106-2 at 2.  Later in that meeting, the Plaintiff agrees to "take

a look and see what you have," and Lucky states that she will "finalize the draft."  *Id.* at 5.  Taken

alone, this evidence might create an issue of fact as to whether the Plaintiff actually refused to

participate in a corrective action plan.  However, in reply, the Defendants point to the Plaintiff's

own deposition testimony.  In that testimony the Plaintiff stated that he told Defendant Rita

Moore "I would not sign [a corrective action plan] without going to HR."  *Docket* # 99-3 at 5.

The Plaintiff then testifies concerning a meeting with Defendant Stambaugh, Fedex's Vice

President of Human Resources, in which the Plaintiff admits that he "probably did" tell Defendant

Stambaugh that he would not sign a corrective action plan if it were presented to him.  *Id.*

Taking the evidence as a whole, it is clear that although the Plaintiff took inconsistent

positions as to the acceptability of a corrective action plan in discussions with his immediate

supervisors, he unequivocally stated to Defendant Stambaugh that he would not sign one.  Were

there evidence in the record that Stambaugh alone was the person who decided to terminate the

Plaintiff, the Plaintiff might be unable to show that reason proffered for his termination was

pretextual.  However, the record is not so clear.  In Defendant Stambaugh's own deposition, he

was asked "who requested the termination or first proposed the idea," to which Stambaugh

replied that he did.  *Docket* # 99-7 at 4.  The question was a compound one, and Stambaugh's

---

R. Evid. 801(d)(2).  The fact that this evidence is currently in a form that would likely  not be
admissible at trial does not prevent the Court from considering it at this stage of the proceedings.

answer does not make clear whether he "requested the termination" or merely whether he "proposed the idea" to others. Defendant Stambaugh's deposition does appear to suggest that others were involved in the decision as well, including Defendant Steve Moore. *Id.* Thus, the Court cannot say that the evidence undisputably shows that Defendant Stambaugh made the decision to terminate the Plaintiff based on his refusal to sign a corrective action plan. Taking the rest of the evidence in the light most favorable to the Plaintiff, there is a possibility that the Plaintiff can show that the Defendants' assertion that he was terminated for refusing to sign a corrective action plan was pretextual.

With regard to the Defendants' assertion that the Plaintiff's conduct was unacceptable, the Plaintiff cites the affidavit of Defendant Stambaugh, in which Stambaugh discusses a concern that the Plaintiff might be a "threat to safety in the workplace," but states that "to be clear . . . [t]he termination was for his refusal to participate in the plan to make himself successful." *Docket #* 99-7 at 5. The jury could reasonably conclude from Stambaugh's testimony that the Plaintiff's allegedly "erratic" conduct in the workplace was not the actual reason for his termination.

Accordingly, the Court finds that there is a triable issue of fact as to all aspects of the Plaintiff's FMLA retaliation claim, and the Defendants are not entitled to summary judgment on that claim.

### C.  Promissory estoppel

The Defendants seek summary judgment on the Plaintiff's claim of promissory estoppel under Colorado law. To prove a claim for promissory estoppel, the Plaintiff must show that: ( i) the Defendants made a promise to the Plaintiff; (ii) that they should reasonably have expected would induce action or forbearance by the Plaintiff; (iii) that the Plaintiff relied on the promise to

11

his detriment; and (iv) the promise must be enforced to prevent injustice.  *Patzer v. City of Loveland*, 80 P.2d 908, 912 (Colo. App. 2003).   The Defendants contend that the Plaintiff cannot establish the first, second, and fourth elements of this claim.

With regard to the first element, whether the Defendants made a promise to the Plaintiff, the Plaintiff contends that the Defendants' motion concedes that promises were made with regard to "additional job responsibilities and continued job security, and to reimburse Plaintiff for expenses incurred by him on defendant FedEx's behalf."  However, the Defendants' motion cites only to portions of the Plaintiff's deposition in which he testified that he was told "if I chose to stay with FedEx . . . there was a lot of additional responsibilities that will be coming up in the future . . . and that he felt that my talents would be applicable in the future."  *Docket* # 99-2 at 4. The Defendants also cite to another portion of the Plaintiff's deposition in which he states that there were misrepresentations as to "job responsibilities that were never made and never continued."  *Id.* at 5. The excerpts cited by the Defendants make no reference whatsoever to promises of job security[5] or reimbursement of expenses, and beyond adopting the representations in the Defendants' motion as his own, the Plaintiff cites to no additional evidence of any such promises.  Accordingly, the Court finds that the only promises to which a promissory estoppel claim could lie are those relating to the Plaintiff being given additional job responsibilities.

---

[5]The Court notes that during the Plaintiff's deposition, in the colloquy concerning the promises that were made to get him to relocate from Arizona, the Plaintiff testified that Defendant Steve Moore promised him that "as long as [Moore] was [at Fedex]," the Plaintiff would be there, too.  *Docket* # 99-2 at 4-5.  However, upon further examination, the Plaintiff conceded that that statement was made by Defendant Steve Moore in June or July 2005, and not in conjunction with his relocation.  *Id.* at 5.  Because the only alleged reliance in the Plaintiff's promissory estoppel claim is his relocation to Colorado in 2004, the Court finds no evidence to support a promissory estoppel claim based on an alleged promise of job security.

The Defendants contend that the Plaintiff cannot show that they could reasonably have expected the Plaintiff to rely on these promises.  In order to be actionable in promissory estoppel, the alleged promise must be sufficient specific that the court can understand the obligation allegedly assumed by the promissor, and enforce the promise according to its terms.  *Hoyt v. Target Stores,* 981 P.2d 188, 194 (Colo. App. 1998), *citing Soderlun v. Public Service Co.*, 944 P.2d 616 (Colo. App.1997).  "Vague assurances" are unenforcible.  *Id.*, *citing Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465 (10th Cir. 1994).  The Plaintiff does not clearly respond to the Defendants' argument on this point.

It is clear that the "promises" cited by the Plaintiff were not sufficiently specific that the Court could enforce them.  The Plaintiff himself admits that the representations were not "specific[ ]" and "general statements."  *Docket* # 99-2 at 4-5.  The Court has no way of determining whether the Defendants honored their "promise," because there is no way of knowing what additional job responsibilities the Defendants would have had to afford the Plaintiff to do so. The Plaintiff's own testimony reveals that he was unable to state what the Defendants had specifically promised him.  Accordingly, the Court finds that the Defendants are entitled to summary judgment on the Plaintiff's promissory estoppel claim.

### D.  Outrageous conduct

The Plaintiff asserts a claim for outrageous conduct against Defendant Steve Moore.  To state a claim for outrageous conduct under Colorado law, the Plaintiff must show: (i) that Defendant Steve Moore engaged in extreme and outrageous conduct; (ii) that he did so recklessly or with the intent of causing the Plaintiff to suffer severe emotional distress; and (iii) that he

actually caused the Plaintiff to suffer such distress.  Defendant Steve Moore challenges the

Plaintiff's ability to establish all three elements.

Turning to the first element, only conduct that is so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious

and utterly intolerable in a civilized community, will suffice.  *Pearson v. Kancilia*, 70 P.3d 594,

597 (Colo. App. 2003), *citing Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo.1988).


In his response, the Plaintiff states that the outrageous acts of Defendant Steve Moore are "too

numerous to list here," but points to supporting evidence as demonstrating several examples.  The

Court considers only those allegations to which the Plaintiff identifies with reference to the

evidence.  *BancOklahoma Mort. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999)

(party opposing summary judgment may not rest on pleadings or conclusory allegations, but must

point to specific evidence); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Specifically, the Plaintiff alleges that Defendant Steve Moore, "in an aggressive and

threatening manner," ordered the Plaintiff to terminated Gibson, an act the Plaintiff believed to be

illegal.  In support of this assertion, the Plaintiff cites to his own exhibits 3, 4, 5, 7, 10, 12, 13, and

16.[6]  At best, Exhibit 3, the Plaintiff's deposition, states that, in a conversation with the Plaintiff,

Defendant Steve Moore "got very angry and ordered me to fire her."  *Docket* # 103-6 at 8.

Exhibit 4 is a collection of e-mails written by the Plaintiff (and sent only to himself), some of

which state that Defendant Steve Moore "made obvious remarks that I did nothing since our last

---

[6]The Plaintiff's brief actually cites to an exhibit 57.  There is no exhibit 57 in the Plaintiff's submission, and the Court assumes that the Plaintiff intended the two digits to be separated by a comma.

14

discussion, which was not true," that "he just cut me off with his perception that nothing was done," and that he "was very negative about my management style, saying that I was too nice a manager, that I allow my people to walk over me, that I 'should read books on management,' [and] that if I couldn't do what was required with [Gibson], that he would." *Docket* # 103-8 at 2, 3; *see also Docket* # 103-9 at 8. Exhibit 5 is a transcript of the Plaintiff's conversation with Defendant Stambaugh, in which the Plaintiff conclusorily states his opinion that "Steven Moore has displayed unprofessional, abusive behavior against a subordinate of mine," and that he "has a very, very hostile – often hostile – if not hostile, predatory way about him," but says nothing specific about Defendant Steve Moore's allegedly hostile treatment of the Plaintiff himself. *Docket* # 105-3 at 1, 5. Exhibit 7 is another excerpt of the Plaintiff's deposition that, taken in the light most favorable to the Plaintiff, alleges that Defendant Steve Moore requested that a security guard escort the Plaintiff out of the building on the day he was terminated, conclusorily asserts that he made "derogatory and embarrassing comments often," and alleges that Defendant Steve Moore stated that the Plaintiff "was a threatening individual." *Docket* # 105-5 at 3. Exhibit 10 are handwritten notes by Lucky of a meeting between the Plaintiff and herself, and states that the Plaintiff "feels that Steve Moore has asked / or instructed him to get rid of [Gibson]. He informed me that he asked [Steve?] if he could [illegible ] him should he + Steve replied 'NO' and asked him if he could handle it or not." *Docket* # 106-3 at 2. Exhibit 12 is typed notes by Defendant Rita Moore regarding her meeting with the Plaintiff, but these notes do not refer to any specific conduct by Defendant Steve Moore towards the Plaintiff. Exhibit 13 is an e-mail from the Plaintiff to Defendant Stambaugh reciting a chronology of events. It states, among other things, that Defendant Steve Moore told the Plaintiff "I don't ever want to hear how great [Gibson] is

15

ever again!"; that he told the Plaintiff that if the Plaintiff couldn't do what he was requesting, he

would find someone else to do it (a comment that the Plaintiff interpreted as "loosely veiled

threats that if you don't do his bidding he will take action against an individual"); that the Plaintiff

believes Defendant Steve Moore "display[ed] half truths and obvious predatory behavior . . . with

severe emotional and physical upset"; that during another meeting with Defendant Steve Moore,

"I was also put on the defensive and he attempted to insist that I agree with inaccurate and

unacceptable behavior traits [and h]e accused me of poor management styles, inappropriate

management behavior and that if my style was not like his, I was wrong"; and that on one

occasion in a meeting, the Plaintiff's back "snapped . . . loudly," that Defendant Steve Moore and

Lucky asked if the Plaintiff was ok, that the Plaintiff replied he was but he was unsure what had

just happened with his back, and the meeting then continued "without his . . . care for my

welfare." *Docket* # 106-6. Finally, Exhibit 16 is a series of additional e-mails from the Plaintiff to

himself, reciting an occasion in which Defendant Steve Moore called the Plaintiff's red shirt a

"sissy shirt"[7]; another occasion in which he referred to an issue (apparently unrelated to the

Plaintiff) as being "as useful as tits on a bull"; and a third occasion in which he stated that his wife

had seen a message on the internet apparently written by the Plaintiff's wife and that, as a result,

"Now we know your wife's political views." *Docket* # 107-2 at 2-3.

The Court need not conduct a labored analysis of this evidence, as it is abundantly clear

that, in nearly all respects, the cited behavior is typical of many workplaces. Indeed, the character

of the brusque, demanding, insensitive boss is ubiquitous in modern entertainment. Such behavior

---

[7]The e-mail notes that "We have kidded about the shirt in the past, but never in front of a large group and not with a derogatory tone."

may not be desirable or pleasant, but it is by no means so indecent and atrocious that society deems it "utterly intolerable."  *Compare Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (terminating employee as scapegoat to cover up the employer's own criminal conduct not sufficiently outrageous); *English v. Griffin*, 99 P.3d 90, 93 (Colo. App. 2004) (engaging in prolonged and heated argument with an individual known by the defendant to be disabled and suicidal not sufficiently not outrageous).  The single incident in which Defendant Steve Moore referred to the Plaintiff's shirt as a "sissy shirt," while certainly not praiseworthy, is not the sort of conduct that society deems to be utterly intolerable.  The fact that the Plaintiff alleges his termination was illegal retaliation for his resisting an act he believed to be illegal also does not support a claim of outrageous conduct, as federal law already provides a remedy for that wrong. *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 385-86 (10th Cir. 1988).  Accordingly, Defendant Steve Moore is entitled to summary judgment on the outrageous conduct claim.

### E.  Defamation

The Plaintiff alleges that the Defendants defamed him in a reference check by a prospective employer.  The Court need not conduct an extensive analysis of this claim, because the Plaintiff's response to the Defendants' motion on this issue cites to no evidence whatsoever in the record.  Although the Plaintiff makes numerous factual assertions, he points to no evidence in the record that would support those assertions.  As a result, the Defendants are entitled to summary judgment on this claim.  *BancOklahoma*, 194 F.3d at 1097.

### F.  Negligence

The Plaintiff's final claim sounds in negligence, and alleges that he suffered an injury[8] at work, and that he was instructed by Fedex to avoid the Worker's Compensation system and instead process his claim through the company's short-term disability policy.  The Plaintiff did so, and, as a result of his termination, lost any continuing benefits under the short-term disability policy.  The precise act that the Plaintiff alleges to be negligent is unclear.  In the conclusion of his brief on this issue, he alleges that "[a]s a result of the negligence of Defendant FedEx Freight's employee in advising the Plaintiff how to handle his injury claim, Plaintiff has had to bear the costs of continued treatment himself."  Thus, the Court interprets the negligence claim to allege only negligence in the instructing of the Plaintiff how to process his claim.

For purposes of this motion, the Court assumes the following facts to be true.  The Plaintiff suffered his injury on December 7, 2004.  *Docket* # 99-14.  At some point within the following six weeks, he contacted Jennie Ramos, Defendant Steve Moore's administrative assistant, who told the Plaintiff that "I don't think you want to go to workmen's comp, it wouldn't look good for you."  *Docket* # 107-3 at 3.  On January 18, 2005, the Plaintiff e-mailed Ramos, asking "Should we have reported my injury in HRO?  Or let sleeping dogs lie?  Don't want to do anything that is not to policy."  *Docket* # 107-4.  Ramos responded "Good question.  I believe you should have; but check with [Lucky] to make sure."  *Id.*  The Plaintiff then talked to Lucky, and that she advised him that "it'll all be taken care of and it'll go through disability."

---

[8]The Plaintiff suffered the injury when he went to a "traveling office" in another Fedex location, went to sit down, and, because the height of the chair had been adjusted to a position the Plaintiff was not expecting, fell down and injured his back.

*Docket* # 107-3 at 5.  Thereafter, on May 2, 2005, the Plaintiff filed a claim for short-term disability, where he reported that his injury was not work-related.  *Docket* # 99-14.

To prove a claim of negligence under Colorado law, the Plaintiff must show: (i) the existence of a legal duty of the Defendants to the Plaintiff; (ii) that the Defendants breached that duty; (iii) that the Plaintiff was injured; and (iv) that the Defendants' breach of duty caused the injury.  *Raleigh v. Performance Plumbing and Heating*, 130 P.3d 1011, 1015 (Colo. 2006).  The Defendants contend that the Plaintiff cannot establish a duty, a breach, or injury.

Assuming – without necessarily finding – that the Defendants had a legal duty to ensure that they did not, by design or accident, mislead the Plaintiff into surrendering his right to claim Worker's Compensation benefits for his injury, and that the instructions from Ramos and Lucky constitute a breach of that duty, the Court nevertheless finds that the Plaintiff has not shown that he has actually been injured by that breach.

Under Colorado law, Worker's Compensation benefits are available only to employees who are injured while "performing service arising out of an in the course of the employee's employment."  C.R.S. § 8-41-301.  In his application for disability benefits, the Plaintiff responded to the question of "is claim due to an on the job illness or injury" by checking "no."  *Docket* # 99-14.  In another line on the same form, the Plaintiff responded to the question "is illness or injury related to occupation" by again checking the box "no."  *Id.*  The Plaintiff has not contended that Fedex directed him to respond to the questions in that manner; indeed, he testified that he "would do everything in my power" to ensure that he filled out the form truthfully and accurately.  *Docket* # 99-2 at 10.  Accordingly, the Court treats the Plaintiff's disability benefits claim form as an admission that the injury he complains of was <u>not</u> sustained in the course and scope of his

19

employment, and thus, the Plaintiff would not have been entitled to Worker's Compensation benefits for that injury even if Ramos and Lucky had properly discharged a duty to advise him to report it.  Because the Plaintiff suffered no injury as a result of the allegedly negligent advice he received, the Defendants are entitled to summary judgment on the negligence claim.[9]

## **CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment **(# 99)** is

**GRANTED IN PART**, insofar as the Defendants are entitled to summary judgment on the

---

[9]In any event, the Court notes that under Colorado's Worker's Compensation scheme, an employee must notify his employer of an injury within four days, C.R.S. § 8-42-102(1)(a), and the employer, in turn, notifies the Worker's Compensation division within 10 days to begin the claim procedure.  C.R.S. § 8-43-103(1).  If the employer fails to notify the division of the injury, the employee is entitled to notify the Worker's Compensation division on his own to start the claim process.  *Id.*  Given the misleading advice allegedly given to the Plaintiff here, he would be permitted to give such notice and thereby claim benefits up to three years after the injury.  C.R.S. § 8-43-103(2).  The record indicates that on September 15, 2006 – less than two years after the Plaintiff's injury – the Defendants' counsel wrote to the Plaintiff's counsel, advising that if the Plaintiff believes his injury was work-related, he should file a claim for Worker's Compensation.  *Docket* # 99-15.  Nevertheless, it appears that the Plaintiff did not do so.  Thus, for this additional and independent reason, the Court finds that, as a matter of law, the misleading advice given to the Plaintiff by Ramos and Lucky was not the proximate cause of his failure to receive Worker's Compensation benefits for his injury.

Plaintiff's promissory estoppel, defamation, outrageous conduct, and negligence claims, and

**DENIED IN PART**, insofar as the Court finds that there are issues of fact requiring a trial on the

Plaintiff's FMLA retaliation claim.

      Dated this 29th day of June, 2007

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

21